**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**BRADLEY R. BOLIN**                                                                 **PLAINTIFF**

**V.**                                          **CASE NO. 5:22-CV-5249**

**DEPUTY LANDON WILKINS, in his official**
**and individual capacities; DEPUTY REEVE KOEHLER,**
**in his official and individual capacities;**
**CORPORAL BENJAMIN VINSON, JR.,**
**in his official and individual capacities;**
**DEPUTY DAVID FISCHER, in his official**
**and individual capacities; SERGEANT LEVI FRANKS,**
**in his official and individual capacities;**
**DEPUTY JOSHUA LOYA, in his official and individual capacities;**
**MPO SAMUEL MOSLEY, in his individual capacity;**
**SERGEANT ADAM BAKER, in his official**
**and individual capacities; DEPUTY SHANNON MONDAY,**
**in his official and individual capacities;**
**DEPUTY DAVIS GOLDEN, in his official**
**and individual capacities; DEPUTY JORDIN BEARD,**
**in his official and individual capacities;**
**DEPUTY LOGAN CORNELISON, in his official**
**and individual capacities; DEPUTY MICHAEL WHITE,**
**in his official and individual capacities;**
**SERGEANT DALTON MARTIN, in his official**
**and individual capacities; LIEUTENANT BRITTANY WRIGHT,**
**in her official and individual capacities;**
**DEPUTY JACK SIMPSON, in his official**
**and individual capacities; DEPUTY CEDRIC LAMPKIN,**
**in his official and individual capacities;**
**DEPUTY BRYAN COOPER, in his official**
**and individual capacities;**
**SHERIFF SHAWN HOLLOWAY, in his official capacity;**
**and BENTON COUNTY, ARKANSAS**                                         **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

On April 1, 2020, just after midnight, Plaintiff Bradley R. Bolin was arrested by the

Rogers Police Department for disorderly conduct, resisting arrest, public intoxication, and

battery in the second degree. Rogers police officer Samuel Mosley transported Mr. Bolin

to the Benton County Detention Center ("BCDC") where he was booked and entered Benton County custody. Mr. Bolin alleges that he was subjected to excessive force in violation of his constitutional rights while in the BCDC. "Incident One" began at approximately 1:00 a.m. in the booking area of the jail. Over the course of about one hour and fifteen minutes, officers used force against Mr. Bolin in the Booking Lobby, in Booking Cell 3, and in Booking Cell 4. "Incident Two" began at approximately 9:00 a.m. in a different part of the jail and involved a different set of officers. Over the course of about fifty minutes, officers used force against Mr. Bolin in a hallway near E-Pod and in E-Pod Cell 103. After Incident Two, the jail nurse recommended that Mr. Bolin be transported to the hospital for treatment of his injuries which included a laceration to his face that required sutures.

Mr. Bolin has sued eighteen officers involved in these two incidents, alleging that they violated his constitutional rights under color of law pursuant to 42 U.S.C. § 1983. Seven of these officers were identified by name in the initial complaint, but the other eleven officers were not identified until October 30, 2023, more than three years after these events occurred. Before the Court are two ripe motions for summary judgment, one brought by separate Defendant Mosley (Doc. 35),[1] who at the time of these events was employed by the City of Rogers, and one filed jointly by the remaining Defendants (Doc. 40),[2] Benton County and the officers it employed ("County Defendants"). For the reasons

---

[1] Mr. Bolin filed a Response in Opposition to the Motion (Doc. 47), and Officer Mosley filed a Reply (Doc. 55).

[2] Mr. Bolin filed a Response in Opposition to the Motion (Doc. 57), and the County Defendants filed a Reply (Doc. 60).

stated below, Defendant Mosley's Motion is **GRANTED**, and the County Defendants' Motion is **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND

The events described below all took place on the same day, April 1, 2020. The Court has been provided with BCDC video footage of all events; however, the BCDC's video equipment does not capture audio. Therefore, no audio accompanies any of the footage with the exception of the Booking Lobby event that took place between 1:00 a.m. and 1:12:45 a.m. This was the only event in which Officer Mosley was present, and his personal recording equipment captured audio, but not video.

The Court has also considered the Jail Incident Reports that were attached to the County Defendants' Motion for Summary Judgment. The Reports labeled "Incident Number 2020-J00540" pertain to what the Court describes below as "Incident One," *see* Doc. 41-1, pp. 8–12, and the Reports labeled "Incident Number 2020-J00542" pertain to what the Court describes as "Incident Two," *see id.* at pp. 13–15. In addition, the Court has taken note of County Defendants' statements of undisputed fact and Mr. Bolin's responses. *See* Docs. 37, 41, 48, 58.

Mr. Bolin's memory of these events is hazy, though he does remember some things in "snapshots." *See* Bolin Dep., Doc. 41-2, pp. 12, 48, 50, 51. The Court was provided with his deposition testimony, the deposition transcripts for Defendants Wilkins (Doc. 41-3), Franks (Doc. 41-4), and Baker (Doc. 41-5), and the Affidavit of Officer Mosley (Doc. 37-2).

**A. Incident One: Use of Force in Booking Lobby and Cells, 1:00 a.m. to 2:25 a.m.**

### 1. Booking Lobby, 1:00 a.m. to 1:12:45 a.m.

At 1:00 a.m., two Benton County Deputies, David Golden and Michael White, wearing khaki shirts and dark pants, escorted Mr. Bolin through the Booking Lobby of the BCDC to the intake window. Mr. Bolin was wearing a dark gray t-shirt and black shorts and had his hands handcuffed behind his back. Officer Mosley followed the three men into the Booking Lobby wearing a navy-blue uniform. Deputies Golden and White then performed a pat down search of Mr. Bolin and put his property into a bag. The deputies were wearing blue latex gloves and face masks, but Mr. Bolin was not wearing a face mask at that time. Deputies Shannon Monday and Joshua Loya were also in the Booking Lobby but were not handling Mr. Bolin.

Almost immediately, the deputies began removing Mr. Bolin's handcuffs. Mr. Bolin placed both hands on the wall in front of him after the handcuffs were off. Then, deputies ordered Mr. Bolin to remove his shoes, and he complied. At 1:02, a deputy handed Mr. Bolin a mask, and he put it on and turned back to place his hands on the wall again. There he stood for the next three minutes.

At 1:05:46, a deputy removed Mr. Bolin's left hand from the wall so that a nurse could take his pulse. This only took a few seconds, though, and Mr. Bolin placed his hands back on the wall. The nurse then approached Mr. Bolin from behind and listened to his chest with a stethoscope. He had told officers earlier that he was sick, possibly with the flu. After the nurse finished listening to Mr. Bolin's chest, Mr. Bolin touched his chest multiple times while talking to the officers, though the audio does not pick up anything

discernible except the word "chest." At 1:06:49, Mr. Bolin returned both of his hands to the wall.

Approximately two minutes later at 1:08:46, Mr. Bolin was permitted to take his hands off the wall in order to sign the property sheet. He did not immediately sign, however. He removed his mask to speak to the officer nearest him. Twenty seconds later, another officer reached over Mr. Bolin's shoulder and put the mask back on Mr. Bolin's face. An officer said to Mr. Bolin, "Brad, Brad, listen to them." But it does not appear that Mr. Bolin signed the property sheet, and an officer removed it from the intake counter.

Two more deputies entered the intake lobby. At that point, Deputies Logan Cornelison, and Jordin Beard were present along with Officer Mosley and Deputies Golden, White, Loya, and Monday—seven law enforcement officers in all. One of the officers said, "Turn around," and at 1:10:03, Mr. Bolin turned to face the wall again and placed his hands behind his back. An officer said, "Brad, do what they're telling you. Doesn't matter. Do what they're telling you." A few second later, at 1:10:13, Mr. Bolin swayed and leaned toward the wall. At that point, the officers who had gathered behind him began pushing him into the corner. Three of the deputies then pulled Mr. Bolin out of the corner and swung him around to face the middle of the room. At 1:10:18, the officers crowded around Mr. Bolin and took him to the ground. Officer Mosley had one arm in front of Mr. Bolin's chest at one point but was pushed out of the way by other officers. Mr. Bolin's right arm and hand were loose during the takedown, but his left arm was being held by an officer. Mr. Bolin reached out with his right hand to brace himself as he hit the floor at 1:10:22.

Once Mr. Bolin reached the floor, his body was completely covered by four deputies and could not be seen on the video; a fifth deputy stood near Mr. Bolin's feet; a sixth crouched near Mr. Bolin's head; and Officer Mosley remained on the floor in the vicinity of Mr. Bolin's head, sometimes reaching out to touch Mr. Bolin's head or upper body. At 1:10:25, the audio from Officer Mosley's body camera picked up an officer yelling, "Knock it off!" And at 1:10:28, an officer said to Mr. Bolin, "Brad, stop."

The Defendants claim that even after Mr. Bolin was on the floor, he continued to refuse to obey commands and placed his hands under his body rather than giving them up for handcuffing. Mr. Bolin denies resisting. Since very little of Mr. Bolin's body is visible in the video, it is difficult to assess whether or how he was resisting.

It is undisputed that at 1:10:36, Deputy Loya placed a taser against Mr. Bolin's back beneath his left shoulder and delivered a five-second drive-stun. Six seconds later, an officer shouted at Mr. Bolin, "Relax! If you don't relax, you're going to get tased, you understand that." Mr. Bolin can be heard on the audio wheezing noisily in the background. Deputy Loya readjusted his taser and placed it on Mr. Bolin's lower back—allegedly because Mr. Bolin was continuing to resist—and delivered another five-second drive-stun. At 1:11:12, Mr. Bolin stated, "I can't, I can't." At 1:11:18, he said, "I'm entitled to my phone call." At 1:11:24, Mr. Bolin was handcuffed while lying prone on his stomach. At 1:11:27, an officer on the floor with Mr. Bolin said, "Brad, breathe," and Mr. Bolin responded, "I can't." And at 1:11:34, Mr. Bolin said twice, "I cannot breathe." In response, an officer told him to relax, and Mr. Bolin said, in between gasps and wheezing, "Please pull my shirt down," to which an officer responded, "Your shirt's not important right now. You need to relax your arms."

Finally, Mr. Bolin was rolled onto his side and assisted to a seated position on the floor. At 1:12:28, Mr. Bolin was pulled to his feet and escorted to Booking Cell 3. Officer Mosley left the BCDC shortly after that and had no other contact with Mr. Bolin.

### 2. Booking Cell 3, 1:12:53 a.m. to 1:15:02 a.m.

Once Mr. Bolin entered Booking Cell 3, he was moved to the back of the cell and directed to kneel and place his hands on the wall until all deputies had exited. The video footage does not show a clear view into the cell, and Mr. Bolin's body is often obscured by the officers standing near him. The deputies who entered the cell with Mr. Bolin were Loya, Golden, Monday, Cornelison, White, and Martin. Deputy Beard stood at the door observing. By 1:13:40, two deputies had exited the cell to stand near Deputy Beard. The other four deputies remained in the cell, blocking Mr. Bolin from the camera's view.

At 1:13:48, four officers were still in the cell. Deputy Loya, who was standing just inside the cell about a foot away from the doorframe, drew his pepper spray gun and pointed it at the cell's back wall. One of the three deputies at the back of the cell moved toward the door to stand beside Deputy Loya, leaving the other two deputies to remove Mr. Bolin's handcuffs. At 1:14:45, the officer standing next to Deputy Loya exited the cell, leaving two officers at the back of the cell. At 1:14:50, one of the officers at the back of the cell exited. Deputy Loya remained in place with his pepper spray gun aimed at Mr. Bolin. Finally, at 1:14:52, the last deputy at the back of the cell began walking backward until he was next to Deputy Loya, about a foot away from the door. Mr. Bolin was kneeling in the back corner of the cell, facing the back wall with his hands on the wall. At that point, Mr. Bolin began turning to face the left wall, placing his left hand on the left wall. He then touched his right hand to the left wall and braced against it to stand.

At 1:14:55, the officer next to Deputy Loya exited. This left only Mr. Bolin and Deputy Loya in the cell. Mr. Bolin had risen to his feet and was turning toward Deputy Loya with his right hand on the left wall and his left hand hanging by his side holding his face mask. Deputy Loya was standing at least six feet away from Mr. Bolin and had his pepper spray gun aimed at Mr. Bolin's face.

At 1:14:56, Deputy Loya backed up a pace so that he was almost even with the doorframe of the cell. Deputy Beard was positioned with her hand on the cell door, ready to shut it once Deputy Loya exited, while the five other deputies gathered around to watch. Mr. Bolin stood facing Mr. Loya with both hands raised over his head in a gesture of surrender; he was against the back wall of the cell with his legs pressed together and his ankles touching. He was not "walking towards the Deputies," as Deputy Golden claimed in his Jail Incident Report. (Doc. 41-1, p. 9).

From 1:14:57 to 1:14:59 Deputy Loya fired four pepper spray balls at Mr. Bolin while backing out of the cell. As he was firing, Mr. Bolin turned to face the back wall of the cell, away from Deputy Loya. After emptying his pepper spray gun on Mr. Bolin, Deputy Loya, now outside the cell, lowered his weapon, and Deputy Beard shut the cell door. All of the officers walked away. The parties appear to agree that two of the four pepper spray balls hit the back wall of the cell, while the other two shots hit the back of Mr. Bolin's head and neck.

As the deputies were walking away, Mr. Bolin approached the glass pane in the door and began knocking on it. He then moved to the cell window and knocked on it, wiping his eyes and pressing them with the heels of his hands. At 1:17:17, an officer spoke to Mr. Bolin briefly through the glass. At 1:19:13, Mr. Bolin used his face mask to

wipe the back of his head, and then he placed the mask against the cell window. The mask appeared streaked with a red substance.

### 3. *Booking Cell 4: 2:14:01 a.m. to 2:24:21 a.m.*

At 2:14:01, approximately an hour after Mr. Bolin was pepper sprayed, four deputies wearing gas masks entered Mr. Bolin's cell. They ordered him to go to the back wall and place his hands against it, and he complied. They then escorted Mr. Bolin to the booking area restroom where he showered and changed into a striped inmate uniform. After that, the officers handcuffed Mr. Bolin and moved him to Booking Cell 4.

The deputies contend that Mr. Bolin started resisting their commands almost immediately and refused to enter the cell—which is not apparent from the video. Five deputies followed Mr. Bolin into Booking Cell 4 at 2:21:51. Due to the camera angle and the fact that so many deputies were in the cell, Mr. Bolin's body was completely obscured from view. However, Deputy Loya admits that he delivered two knee strikes to the back of Mr. Bolin's thigh and Deputy Golden delivered several closed-fist strikes to Mr. Bolin's lower back, allegedly because Mr. Bolin's refused to lie down on the ground. Mr. Bolin responds that he did not resist and that Deputies Loya and Golden simply beat him without provocation because they were angry at him. The video footage neither confirms nor refutes either party's version of events.

At 2:24:09, the five deputies began filing out of Booking Cell 4, and Mr. Bolin's body finally appeared on screen, lying on the floor. Once the cell door closed at 2:24:21, Mr. Bolin stood up and walked to the cell door. Later, officers took him to the jail nurse, who determined that his injuries were not severe enough to warrant hospitalization.

**B.  Incident Two: Use of Force in the E-Pod Area, 9:25 a.m. to 9:53 a.m.**

*1.  E-Pod Hallway, 9:25 a.m. to 9:32 a.m.*

At approximately 9:25 a.m., Mr. Bolin walked by himself down the hallway located by E-Pod control. He was unshackled, wearing a prison uniform, and holding some property in his right hand. He maintains that his parents had just bailed him out and he was about to be released—and the Court cannot find evidence to the contrary in the summary judgment record. He stood patiently, his left hand on his hip, unguarded and silent, for two minutes.

At 9:27:27, Deputy Landon Wilkins approached Mr. Bolin and pointed to the wall. Deputy Wilkins maintains that he told Mr. Bolin to place his belongings on the ground and his hands on the wall. Instead of complying, though, Mr. Bolin reached for the light switch on the wall and turned the lights off and then on again. Deputy Wilkins claims he once again ordered Mr. Bolin to put his hands on the wall. Since the video lacks audio, it is unknown what the two men said to one another, but at 9:27:43, Deputy Wilkins pointed at the ground, and Mr. Bolin bent and placed his belongings on the floor. Mr. Bolin and Deputy Wilkins agree that Mr. Bolin then told Deputy Wilkins that he did not know what to do next, so Deputy Wilkins instructed him to put his hands on the wall. At 9:27:57, Mr. Bolin put his right hand on the wall, but not his left. He then turned around to say something to Deputy Wilkins.

According to Deputy Wilkins's Jail Incident Report, he next "took control of [Mr. Bolin's] left hand and placed it in [sic] the wall." (Doc. 41-1, p. 13). The video confirms this. Both of Mr. Bolin's hands now touched the wall.  Deputy Wilkins stood behind him, leaning his chest slightly against Mr. Bolin's back and grasping Mr. Bolin's left wrist.

At 9:28:01, Deputy Wilkins released Mr. Bolin's wrist and shifted his weight forward, leaning into Mr. Bolin's left shoulder. An instant later, Deputy Wilkins raised his left arm and grabbled Mr. Bolin's forearm, yanking it backward. Mr. Bolin cringed away just before the blow, shrugging his left shoulder toward his left ear—but keeping his hands flat against the wall as instructed. Then at 9:28:02, with his left hand on Mr. Bolin's left forearm and his right hand on Mr. Bolin's right shoulder, Deputy Wilkins spun Mr. Bolin around and hurled him to the floor. Deputy Wilkins explains in his report that he performed this maneuver because Mr. Bolin "tensed up and began to straighten his arms," and Deputy Wilkins believed he needed to "gain control of Inmate Bolin's left arm" by "plac[ing] him on the ground." *Id.* However, the report also states that Deputy Wilkins was "in control" of Mr. Bolin's left arm just before the blow, and the recording does not show Mr. Bolin tensing up and straightening his arms. Further, Deputy Wilkins clearly did not "place" Mr. Bolin on the ground, but instead threw him to the ground, causing Mr. Bolin's head to hit the opposite wall at 9:28:04.

The two men struggled on the ground for the next three seconds. Deputy Wilkins lay on top of Mr. Bolin's right arm and chest, trying to grab Mr. Bolin's right hand. Officer Wilkins states in his report that "Inmate Bolin began to sit up." *Id.* The video shows Officer Wilkins behind Mr. Bolin with his right arm under Mr. Bolin's right arm and across his chest. It is not clear whether Mr. Bolin was pushing to sit up or whether Officer Wilkins was pulling Mr. Bolin upright. Then, at 9:28:14, Deputy Wilkins rolled on top of Mr. Bolin, bringing Mr. Bolin down to lay on his left side. Deputy Wilkins claims that Mr. Bolin bit his left ring finger—which Mr. Bolin denies. Over the course of ten seconds, beginning at 9:28:18 while Mr. Bolin lay on his side, Deputy Wilkins delivered twelve closed-fist strikes

to Mr. Bolin's head and torso. While Officer Wilkins was punching Mr. Bolin with his left hand, his right hand was holding Mr. Bolin's right hand away from Mr. Bolin's head, such that Mr. Bolin could not raise that hand to protect his face. In the moments when Mr. Bolin's right arm was not obscured by Deputy Wilkins's body, it appeared that Mr. Bolin was trying to raise that arm to cover his face.

Three officers ran down the hall to assist Deputy Wilkins at 9:28:28. Deputy Reeve Koehler delivered a strike to Mr. Bolin's shoulder. Deputy David Fischer fell onto Mr. Bolin's body, trying to secure his hands. Corporal Benjamin Vinson delivered two knee strikes and a closed-fist strike to Mr. Bolin's left side. Then, Sergeant Levi Franks came on the scene, went to the ground with Mr. Bolin, and deployed his taser twice to secure Mr. Bolin's compliance at 9:28:41—though Mr. Bolin maintains that he was not resisting when he was tased.

Other than Officers Wilkins, Koehler, Fischer, Vinson, and Franks, the BCDC staff members who assisted or were otherwise present in the hallway were Deputies Cedric Lampkin and Jack Simpson and Lieutenant Brittany Wright.[3] These three officers either held Mr. Bolin against the wall, placed him on the floor, or held his arms for handcuffing.

By 9:29:18, officers had placed Mr. Bolin in handcuffs, and by 9:32, they helped him to his feet and escorted him down the hallway to the nurses' station.

### 2. *Pod E-103, Cell 131, 9:40:42 a.m. to 9:53 a.m.*

While he was being treated for his injuries by the BCDC's nursing staff, Mr. Bolin made the statement, "I wish you guys would go ahead and kill me to get it over with." (Doc. 41-1, p. 14). Nursing staff interpreted this comment as a desire for self-harm, so

---

[3] Deputy Kevin Miller was also present, but he was not named as a defendant.

Mr. Bolin was ordered to dress in a tamper-resistant smock. At 9:40:42, four officers led Mr. Bolin to a cell in Pod E-103. His hands were handcuffed behind his back. Once he and the officers entered the cell at 9:41:17, there is a missing section in the video—the next two minutes of events inside the cell go unrecorded. When the video resumes at 9:43:17, multiple officers inside the cell are seen hitting, punching, and kicking Mr. Bolin, who is on the ground but not visible on camera. The attack continues until 9:43:33, when another video gap causes the recording to skip ahead by about a minute and a half to 9:45:10—but by that point, the conflict is over.

Five officers, by their own admission, were involved in this incident. They were tasked with the job of placing Mr. Bolin in the tamper-resistant smock. The first officer, Deputy Fischer, stated in his Jail Incident Report (Doc. 41-1, p. 14) that Mr. Bolin "was actively resisting deputies," and, in the end, Deputy Fischer had to "cut Inmate Bolin's stripes off him." The second officer, Deputy Koehler, claimed in his Jail Incident Report (Doc. 41-1, p. 13) that once Mr. Bolin's handcuffs were removed, he "attempted to stand up," which prompted Deputy Koehler to deliver two knee strikes to the left half of Mr. Bolin's body and place him on the floor. The third officer, Deputy Wilkins, explained in his Jail Incident Report (Doc. 41-1, p. 13) that when Mr. Bolin "began to fight Deputies," Deputy Wilkins had to "take control" of Mr. Bolin's left leg. The fourth officer, Corporal Vinson, admitted in his Jail Incident Report (Doc. 41-1, p. 14) that he used his own body weight to "appl[y] pressure to Inmate Bolin's upper body" after Mr. Bolin attempted to stand once his handcuffs were removed. The fifth and final officer in the E-Pod cell with Mr. Bolin was Sergeant Franks. His Jail Incident Report (Doc. 41-1, pp. 14–15) revealed that Mr. Bolin did, in fact, comply with officer commands to drop to his knees and place

his hands on the wall. However, Mr. Bolin "started to stand up" after that, which obliged Sergeant Franks to tase him—twice. *Id.* at p. 15. On the video recording of the incident, Sergeant Franks can be seen at 9:45:25 handling his taser and collecting the spent prongs.

Mr. Bolin has no specific memories of what occurred in these attacks and what each officer did in particular; but he denies disobeying any commands.

He was escorted from the cell completely naked and in handcuffs, his face bloody. The jail nurse ordered him to the hospital where he received sutures for a laceration on his face and treatment for his other injuries. He contends that the events described above left him with permanent pain and diminished sight in his right eye, short-term memory loss, and psychological problems. Defendants argue in their summary judgment motions that none of the force they exerted against Mr. Bolin on April 1, 2020, was excessive and that they are entitled to qualified immunity.

## II.  LEGAL STANDARD

### A.  Summary Judgment

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

475 U.S. 574, 586–87 (1986); *Nat'l. Bank of Com. of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999).

### B. Constitutional Rights of Pretrial Detainees

At the time of these incidents at the BCDC, Mr. Bolin was a pretrial detainee who had not been convicted of any crime. Therefore, his relevant constitutional rights arise under the Due Process Clause of the Fourteenth Amendment, which protects him "from the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989);*Glover v. Paul*, 78 F.4th 1019, 1021 (8th Cir. 2023) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979)). "[T]he Due Process Clause prohibits *any* punishment of a pretrial detainee, be that punishment cruel-and-unusual or not." *Edwards v. Byrd*, 750 F.3d 728, 732 n.2 (8th Cir. 2014). The Eighth Amendment does not apply to pretrial detainees, but their rights under the Fourteenth Amendment "are '*at least as great* as the Eighth Amendment protections available to convicted prisoners.'" *Walton v. Dawson*, 752 F.3d 1109, 1117 (8th Cir. 2014) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

"A detainee alleging an excessive use of force must show that the force used against him was objectively unreasonable." *Glover*, 78 F.4th at 1021. In deciding this issue, the court must assess whether the officer's actions were "rationally related to a legitimate nonpunitive governmental purpose," and whether the actions "appear excessive in relation to that purpose." *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015). The inquiry is objective; in other words, there is no need for the plaintiff to prove that an officer subjectively intended to punish a detainee. *Id.* Instead, "a court must judge the reasonableness of the force used from the perspective and with the knowledge of the

defendant officer," also taking into account "the legitimate interests in managing a jail" and the jail's need "to maintain order and institutional security." *Id.* at 399–400.

### C. Qualified Immunity

When a government official, such as a police officer or sheriff's deputy, is accused of violating an individual's constitutional rights, qualified immunity will shield that government official from liability unless his conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This is a two-step inquiry. In order for a plaintiff to overcome an officer's defense of qualified immunity, he must show: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009). "Whether an officer is entitled to qualified immunity because he 'acted reasonably under settled law in the circumstances' is a question of law for the court, both before and after trial." *New v. Denver*, 787 F.3d 895, 899 (8th Cir. 2015) (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)).

"For a right to be deemed clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Buckley v. Rogerson*, 133 F.3d 1125, 1128 (8th Cir. 1998) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The question is whether the law gave the officials 'fair warning that their alleged conduct was unconstitutional.'" *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009) (quoting *Brown v. Fortner*, 518 F.3d 552, 561 (8th Cir.

2008)). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

When assessing qualified immunity at the summary judgment stage, the Court must grant the nonmoving party "the benefit of all relevant inferences." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009) (quoting *Plemmons v. Roberts*, 439 F.3d 818, 822 (8th Cir. 2006)). "[I]f there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." *Id.* (internal quotation marks omitted) (quoting *Tlamka v. Serrell*, 244 F.3d 628, 632 (8th Cir. 2001)).

## III. DISCUSSION

### A.  Dismissal of Time-Barred Claims Against Eleven of the Defendants

County Defendants' first argument is that eleven Defendants must be dismissed because they were identified after the relevant statute of limitations period had run on all of Mr. Bolin's claims. The incidents described above all took place on April 1, 2020. The United States Court of Appeals for the Eighth Circuit has held that excessive force claims filed in Arkansas under § 1983 are subject to a three-year statute of limitations. *See Spradling v. Hastings*, 912 F.3d 1114, 1119 (8th Cir. 2019); *Ketchum v. City of West Memphis*, 974 F.2d 81, 82 (8th Cir. 1992). Therefore, absent some tolling argument, Mr. Bolin was obligated to identify all defendants and causes of action related to the April 1, 2020 incident by no later than April 1, 2023. That did not happen.

Seven individual officers—Wilkins, Koehler, Vinson, Fischer, Franks, Loya, and Mosley—were identified by name in the original complaint filed on December 27, 2022 (Doc. 2). Eleven individual officers—Monday, Wright, White, Lampkin, Simpson, Baker, Martin, Cornelison, Cooper, Beard, and Golden—were first identified by name on October

27, 2023, in Mr. Bolin's Amended Complaint (Doc. 24). These eleven Defendants were named more than six months after the three-year statute of limitation period ran on Mr. Bolin's April 2020 claims. Mr. Bolin's original complaint sued "nine unknown named deputy officers of Benton County, Arkansas" and generally described what roles each of these officers played in the incidents in the complaint. (Doc. 2).

Mr. Bolin first argues that the eleven officers named after the statute of limitations expired should remain in the case because the Amended Complaint relates back to the original complaint pursuant to Rule 15(c)(1)(C). However, that particular Rule states that an amendment that "changes the party or the naming of the party against whom a claim is asserted" relates back only if: (1) "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading"; (2) "the party to be brought in by the amendment received such notice of the action that it will not be prejudiced in defending on the merits"; (3) that party "knew or should have known that the action would have been brought against it, *but for a mistake* concerning the proper party's identity"; and (4) the second and third of these requirements were met "within the period provided by Rule 4(m) for serving the summons and complaint." *Lee v. Airgas Mid-South, Inc.*, 793 F.3d 894, 897 (8th Cir. 2015) (internal citations and alterations omitted). Here, the relation-back analysis under Rule 15(c)(1)(C) hinges on whether failing to name a John Doe tortfeasor qualifies as a "mistake." Unfortunately for Mr. Bolin, the Eighth Circuit has foreclosed this argument. *See Heglund v. Aitkin Cnty.*, 871 F.3d 572, 579 (8th Cir. 2017) (concluding in a § 1983 case "that naming a John Doe defendant is not a 'mistake'" justifying relation back under Rule 15(c)(1)(C)).

Next, Mr. Bolin argues that Rule 15(c)(1)(A) provides another possible avenue to relate the Amended Complaint to the original complaint and keep the previously unnamed Defendants in the case. Rule 15(c)(1)(A) states that an amended pleading relates back to an earlier-filed one "when . . . the law that provides the applicable statute of limitations allows relations back." Here, Arkansas Code § 16-56-105(3) provides the applicable three-year statute of limitations for personal injury claims—including excessive force claims under § 1983. That same subchapter of the Code states that "[f]or purposes of tolling the statute of limitations[,] any person . . . may file a complaint stating his or her cause of action," and if the name of a tortfeasor's name is unknown, "[t]he name of the unknown tortfeasor shall be designated by the pseudo-name John Doe or, if there is more than one (1) tortfeasor, John Doe 1, John Doe 2, John Doe 3, etc." Ark. Code Ann. § 16-56-125(b)(1) ("John Doe Statute"). In other words, Arkansas's John Doe Statute allows a plaintiff to identify tortfeasors after the statute of limitations has run on a claim and relate the newly named defendants back to the original, timely pleading. There is a catch, though.

To satisfy the John Doe Statute, "It *shall* be necessary for the plaintiff or plaintiff's attorney to file with the complaint an affidavit that the identity of the tortfeasor is unknown before this section shall apply." Ark. Code Ann. § 16-56-125(c) (emphasis added). Since neither Mr. Bolin nor his attorneys attached an affidavit to the original complaint in compliance with the John Doe Statute, the eleven new Defendants in the Amended Complaint do not relate back to the unnamed ones in the original complaint.[4] Therefore,

---

[4] Mr. Bolin's reliance on *Smith-Dandridge v. Geanolous*, 2020 WL 4253306 (W.D. Ark. July 24, 2020), is misplaced. Though the district court in that case found that the newly named defendants related back to the John Does in the original complaint, the plaintiff

all claims against Defendants Monday, Wright, White, Lampkin, Simpson, Baker, Martin, Cornelison, Cooper, Beard, and Golden are **DISMISSED WITH PREJUDICE** on summary judgment because they were identified after the expiration of the applicable statute of limitations.[5]

### B. Incident One: Liability of Officer Mosley and Deputy Loya

The only Defendants who were involved in Incident One and were timely identified by Mr. Bolin are Officer Mosley and Deputy Loya. Both Defendants were present for the first part of Incident One in the Booking Lobby, but only Deputy Loya was present for the later events in Booking Cells 3 and 4.

### 1. Booking Lobby

Beginning with the Booking Lobby event, the Court finds that the evidence provided, including video and audio evidence, does not establish that Mr. Bolin was failing to obey orders, resistant, non-compliant, or posing a physical threat to any of the officers immediately before he was forced to the ground, nor at any point afterward while he was on the ground when his body was mostly obscured from view by the officers. Therefore, there remains a genuine, material dispute of fact as to whether the use of force in the Booking Lobby was justified in any way. Viewing the facts in the light most favorable to Mr. Bolin, the Court cannot see how seven officers tackling an unarmed, barefoot man

---

had clearly complied with the John Doe Statute's mandatory provisions by filing an affidavit that conformed to § 16-56-125(c). *See id.* at *4. No such affidavit was filed in the instant case.

[5] The Court's ruling in this regard applies equally to Mr. Bolin's parallel excessive-force claims under the Arkansas Civil Rights Act, *see Hutcherson v. Rutledge*, 2017 Ark. 359, at 4 (Ark. 2017) (recognizing a three-year limitations period), and under Arkansas Code § 16-118-107, which permits a crime victim to file a civil personal-injury action—which carries with it a three-year limitations period.

with his hands behind his back could serve a "legitimate nonpunitive governmental purpose." *Kingsley*, 576 U.S. at 398. The video shows Mr. Bolin removing his mask for a brief period of time, refusing to sign a property intake sheet, and then swaying toward the wall. A jury could find that the response to these actions was excessive and did not advance the BCDC's goals of keeping order and creating a safe environment for officers and detainees. To the contrary, the escalation likely created *additional* risk to staff and detainees.

Notably, Officer Mosley applied minimal force to Mr. Bolin during this incident. He assisted other officers initially in helping bring Mr. Bolin to the floor, but after that, it is unclear whether he restrained Mr. Bolin at all or merely crouched near his head as he remained on the ground. Since the video provides a clear view of all of Officer Mosley's actions, it is evident that he did not strike Mr. Bolin, tase him, or otherwise cause him bodily injury. At most, Mr. Bolin might argue that Officer Mosley failed to intervene to stop other officers from using excessive force in his presence. *See Krout v. Goemmer*, 583 F.3d 557, 565 (8th Cir. 2009). However, even if that were the case, Officer Mosley would be entitled to qualified immunity as Mr. Bolin has failed to cite to any law that shows it was clearly established at the time that Officer Mosley was required to intervene under the circumstances. The force event in the Booking Lobby lasted only two minutes. The situation was rapidly changing, and there were seven officers in a very small space shouting, fighting, and deploying tasers. Officer Mosley found himself swept into a position near Mr. Bolin's head—not necessarily by design—and once the force event ended, he handcuffed Mr. Bolin and told him to breathe and relax. Therefore, all claims against Officer Mosley are **DISMISSED WITH PREJUDICE**.

Deputy Loya's acts of force were far more serious than Officer Mosley's. "Whether the force used was reasonable is 'judged from the perspective of a reasonable officer on the scene' and in light of the particular circumstances." *Story v. Norwood,* 659 F.3d 680, 686 (8th Cir. 2011) (quoting *Graham,* 490 U.S. at 396–97). The Court must therefore evaluate "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson v. McMillian,* 503 U.S. 1, 7 (1992) (quotation and citation omitted).

Deputy Loya admits that he tased Mr. Bolin twice during the Booking Lobby incident while Mr. Bolin was lying on the ground. The use of a taser on a detainee constitutes excessive force unless the detainee is resisting and can be considered a security risk. *Smith v. Conway Cnty.,* 759 F.3d 853, 861 (8th Cir. 2014) (clearly established that a non-violent detainee has a "constitutional right to be free from being tased for non-compliance"); *Edwards v. Byrd*, 750 F.3d 728, 732 (8th Cir. 2014) (clearly established that the use of force against a pretrial detainee who was not resisting or being aggressive was unconstitutional under the Fourteenth and Eighth Amendments). Certainly, the Constitution permits the "good faith applications of force where it is reasonably thought to be necessary to maintain the order and security of a penal institution, but summary force has yet to be ratified as the *de jure* method of discipline where security concerns are not immediately implicated." *Hickey v. Reeder*, 12 F.3d 754, 759 (8th Cir. 1993).

In *Franklin v. Franklin County*, 956 F.3d 1060, 1062 (8th Cir. 2020), the Eighth Circuit found that tasing a plaintiff three times in drive-stun mode while he was in

handcuffs did not violate his constitutional rights. However, just prior to tasing, the plaintiff fought with other inmates, challenged a sheriff's deputy to a fight, threw objects at the sheriff's deputy, and refused to enter his cell. *See id.* at 1061. By contrast, viewing the summary judgment evidence from Mr. Bolin's perspective, he behaved neither threateningly nor violently immediately before he was taken to the floor, and the officers who piled on top of him obscured Mr. Bolin's actions once on the floor.

A reasonable jury viewing the video could conclude that Mr. Bolin was not resisting officer commands—even passively resisting—or posing a threat to officer safety, such as to justify forcing Mr. Bolin to the ground and then tasing him more than once while five officers were holding him down. Thus, on that interpretation, Deputy Loya's conduct in the Booking Room violated Mr. Bolin's constitutional right to be free of excessive force by tasing him when he was not resisting or posing a security risk. Further, such right was clearly established at the time: According to Eighth Circuit law, tasing is not justified if a detainee is "no longer acting aggressively" or is "attempting to comply," and officers may not use force on detainees where "[n]o 'security concern' or disciplinary necessity is apparent." *Smith*, 759 F.3d at 861. Accordingly, Deputy Loya's request for qualified immunity is **DENIED** with respect to his use of force in the Booking Lobby.

### 2. *Booking Cell 3*

Deputy Loya shot four balls of pepper spray at Mr. Bolin in approximately two seconds. He did this while Mr. Bolin was unarmed and standing against the back of the cell in a nonaggressive stance with his hands raised in apparent surrender. At the time the pepper spray was deployed, no other officer was in the cell besides Deputy Loya, who by his own admission was standing at least six feet away from Mr. Bolin. In addition,

Deputy Loya began firing when he was standing nearly in the threshold of the cell door with multiple officers behind him and one officer holding the door, ready to shut it when Deputy Loya exited, and continued firing as he was fully outside the cell. Two of the shots hit Mr. Bolin in the back of the head and neck because Mr. Bolin had turned around to face the wall.

Deputy Loya and the other officers say that Mr. Bolin disobeyed commands to stay on his knees with his hands touching the wall until all officers had exited the cell. But even if he disobeyed this command, such noncompliance absent a threat to officers by a pretrial detainee does not warrant an act of force in every instance—and shooting pepper spray into a prisoner's head is, indeed, an act of force. *See Tatum v. Robinson*, 858 F.3d 544, 550 (8th Cir. 2017) (noting that "[p]epper spray can cause more than temporary pain" and quoting *Brown v. City of Golden* Valley, 574 F.3d 491, 500 n.6 (8th Cir. 2009), for the finding that tasers and pepper spray "are coequals on the use of force continuum").

The case of *Treats v. Morgan* is instructive here. 308 F.3d 868, 874 (8th Cir. 2002). In *Treats*, the Eighth Circuit affirmed the district court's denial of summary judgment where an inmate of the Arkansas Department of Correction was pepper sprayed for disobeying a corrections officer's direct command to take a copy of a form. *Id.* at 870. The officer did not warn the inmate before spraying, and the court observed that the officer did not point to any rule or reason why Treats was required to take a copy of the form. *Id.* at 872. The officer's argument was simply that disobeying a direct command in a prison setting justifies a minimal use of force, such as pepper spray—but the Eighth Circuit disagreed, finding "[t]he law recognizes that order and discipline are important in running a correctional institution, but that does not authorize the arbitrary use of force, nor does it

24

justify punitive use of force on difficult inmates not posing a real threat to other persons or raising security concerns." *Id.* (internal citations omitted).

In the instant case—unlike *Treats*—Deputy Loya warned Mr. Bolin that he would shoot him with pepper spray if Mr. Bolin disobeyed the order to stay on his knees with his hands on the wall until all officers exited. It appears that Mr. Bolin did disobey the order, but that does not mean that Deputy Loya's response was appropriate—or constitutional. Again, Mr. Bolin was a pretrial detainee and could not be subjected to punishment at all. *See Edwards*, 750 F.3d at 732 n.2. Deputy Loya was only permitted to use force against Mr. Bolin for a legitimate nonpunitive purpose, and under the circumstances here, the possible legitimate purpose for spraying Mr. Bolin was guaranteeing Deputy Loya's safety as he exited the cell. Viewing the facts in the light most favorable to Mr. Bolin, his failure to remain on his knees with his hands against the wall would not be viewed as a safety issue for Deputy Loya—given that Deputy Loya was less than a foot away from the door and at least six feet from Mr. Bolin, and Mr. Bolin was standing against the back wall with his hands in the air and his feet together in a nonaggressive stance. A reasonable jury viewing the video evidence could conclude that Deputy Loya deployed the pepper spray merely to punish Mr. Bolin. Whether Deputy Loya was justified in pepper spraying Mr. Bolin is therefore a jury question.[6]

---

[6] Even assuming Deputy Loya was justified in his first shot of pepper spray, a reasonable jury could find that the degree of force used—four deployments with two hitting Mr. Bolin—was excessive, given the objective indicators that Mr. Bolin posed no threat to officers and that Deputy Loya had practically exited the cell, remaining only to shoot the pepper spray. The Court also notes the BCDC's Policies and Procedures, which state with regard to the use of chemical agents such as pepper spray guns: "Discharging of the device is normally limited to one successful hit, not exceeding one (1) full second of target suppression, or the termination of the violent or threatening behavior. Multiple hits may be needed to control violent behavior." (Doc. 41-1, p. 36).

Assuming that Mr. Bolin's constitutional rights were violated during the pepper spray incident, he must still establish that such rights were clearly established at the time in order to defeat Deputy Loya's claim of qualified immunity. The *Treats* court observed that it was "well established" in 2002 that "malicious and sadistic use of force by a prison official against a prisoner, done with the intent to injure and causing actual injury, is enough to establish a violation of the Eighth Amendment's cruel and unusual punishment claims." 308 F.3d at 875 (cleaned up). Here, Mr. Bolin faces an even lower burden, as he was a pretrial detainee and need not show maliciousness. Furthermore, a reasonable law enforcement officer in 2020 would have known that he "do[es] not have a blank check to use force whenever a prisoner is being difficult." *Id.* Deputy Loya's request for qualified immunity is **DENIED** as to his use of pepper spray in Booking Cell 3.

### 3. Booking Cell 4

Deputy Loya admits that after Mr. Bolin had washed off the pepper spray and was moved to a different cell, he delivered two knee strikes to the back of Mr. Bolin's thigh. Though Deputy Loya claims the force he used was a necessary response to Mr. Bolin's refusal to lie down on the ground at that time, the video evidence viewed in the light most favorable to Mr. Bolin indicates that he was not resisting and that Deputy Loya struck him without provocation. Furthermore, Defendants fail to cite to any evidence or make any argument to explain why an order to lie down on the ground in order to remove a pair of handcuffs was not an arbitrary command such that noncompliance would pose no safety risk. After all, the Constitution permits "good faith applications of force" that are "necessary to maintain the order and security of a penal institution," but resorting to force to secure a detainee's compliance with an arbitrary command unrelated to safety,

security, or the efficient management of a jail is not constitutional. *Hickey v. Reeder*, 12 F.3d 754, 759 (8th Cir. 1993).

In any event, the video evidence does not reveal Mr. Bolin in the cell because the officers are standing in front of him, completely obscuring him from view. It is Mr. Bolin's word against Deputy Loya's, and the jury should have the opportunity to evaluate each man's credibility. Summary judgment as to Mr. Bolin's claim against Deputy Loya for excessive force in Booking Cell 4 is **DENIED**.

### C. Incident Two: Liability of Wilkins, Koehler, Fischer, Vinson, and Franks

#### 1. *E-Pod Hallway*

Viewing the video evidence in the light most favorable to Mr. Bolin, there is a genuine, material dispute as to whether Deputy Wilkins used excessive force when he took Mr. Bolin to the floor, knocking his head against the wall in the process and starting the chain of events that would lead Mr. Bolin to suffer more injuries. A reasonable juror could view Mr. Bolin as having complied with Deputy Wilkins's commands just prior to Deputy Wilkins's aggressive and violent arm sweep and tackling Mr. Bolin to the ground. Deputy Wilkins asked Mr. Bolin to put his hands against the wall, and immediately before the takedown, both of Mr. Bolin's hands were against the wall, as ordered. In addition, just before Deputy Wilkins encountered Mr. Bolin, he was standing, uncuffed and unmonitored, for several minutes because he was waiting to be released after having made bail—which tends to show that he was not viewed as an ongoing safety threat. These circumstances, viewed in Mr. Bolin's favor, make the takedown and subsequent escalation of violence seem that much more gratuitous and unjustified. The Court

therefore finds that Deputy Wilkins's initial use of force—viewed in the light most favorable to Mr. Bolin—violates the Fourteenth Amendment.

The Court acknowledges, however, that Deputy Wilkins still will be entitled to qualified immunity if it was not clearly established at the time that such a takedown would have violated Mr. Bolin's constitutional rights. Deputy Wilkins argues his use of force was justified because Mr. Bolin "tensed up and began to straighten his arms." (Doc. 41-1, p. 13). In 2021, the Eighth Circuit held, on similar facts, that it has been clearly established since 2015 that "[a]mbiguous gestures that officers claim are noncompliant (such as reaching to extinguish a cigarette) do not justify body slamming an otherwise compliant, nonviolent, nonthreatening misdemeanant." *MacKintrush v. Pulaski Cnty. Sheriff's Dep't*, 987 F.3d 767, 771 & n.2 (8th Cir. 2021) (citing *Karels v. Storz*, 906 F.3d 740, 747 (8th Cir. 2018)). In that case, the arrestee "appeared agitated" during booking, so officers were escorting him to a cell to calm down. One of the officers placed his hand on the arrestees' shoulder and the arrestee shrugged him off. *Id.* at 769. The officer responded by lifting and slamming the arrestee to the floor, knocking him unconscious. *Id.* The Eighth Circuit affirmed the District Court's denial of qualified immunity. *Id.* at 771.

While *Karels* and *MacKintrush* both dealt with misdemeanants and Mr. Bolin was charged with a felony, the Eighth Circuit has also recently denied qualified immunity to an officer who "slammed [a detainee] down onto a hard concrete floor" with "no advance warning" and no "effort 'to temper or limit the amount of force.'" *Fuller v. Hafoka*, 2023 WL 1487884, at *2 (8th Cir. Feb. 3, 2023) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). There, the detainee was charged with a felony but the Eighth Circuit still found that the "cases clearly forbid a 'violent[ ] takedown' of an individual 'who [is] not

threatening anyone' or 'attempting to flee.'" *Id.*[7] Accordingly, Deputy Wilkins's request for qualified immunity for the takedown in the E-Pod Hallway is **DENIED**.

As for Deputies Koehler and Fischer, Corporal Vinson, and Sergeant Franks—who ran down the hallway to assist Deputy Wilkins—they are entitled to qualified immunity. When these officers arrived at the scene, they did not know the context. A reasonable officer surveying the scene would have believed that force was necessary to subdue an inmate who was grappling with an officer. Jail employees "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham,* 490 U.S. at 397. And the Court acknowledges that it "must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer." *Kingsley*, 576 U.S. at 399. Therefore, Defendants Wilkins, Koehler, Fischer, Vinson, and Franks are **GRANTED** summary judgment on all claims of excessive force against them that took place in the E-Pod Hallway.

### 2. *Pod E-103*

Mr. Bolin was beaten so severely in Pod E-103 that afterward he was sent to the hospital for treatment for his injuries, including a facial laceration that required sutures. He has no specific memory of this beating, so the only available evidence comes from the video, the officers Jail Incident Reports, and their other sworn statements. Viewing this evidence in the light most favorable to Mr. Bolin, he walked into the cell—though perhaps a bit hesitantly—wearing handcuffs and surrounded by officers. The video cuts

---

[7] Although the Eighth Circuit had not decided *Fuller* by the time that Officer Wilkins took down Mr. Bolin, the takedown at issue in *Fuller* occurred in 2017, so the right must have been clearly established as of that year and is therefore also clearly established as of 2020. *See Fuller v. Hafoka*, 2021 WL 3036907, at *3 (D. Minn. July 19, 2021), *aff'd*, 2023 WL 1487884 (8th Cir. Feb. 3, 2023).

out for two minutes, and when the picture reappears, officers have piled on top of Mr. Bolin and are striking him repeatedly. Defendants cannot ask the Court to assume that the missing video proves their assertion that Mr. Bolin was not being compliant when Mr. Bolin testified that he was.

With respect to each Defendant's specific conduct, Corporal Vinson only used his body weight to apply pressure to Mr. Bolin's upper body, Deputy Wilkins took control of Mr. Bolin's leg in the fracas, and Deputy Fischer cut Mr. Bolin's striped uniform from his body. There are no contrary facts to consider as to these three officers, as Mr. Bolin cannot remember the specifics of each officer's actions in the cell, and the video does not clarify matters. All Mr. Bolin remembers is that he did not resist or disobey commands. In any event, even if Vinson, Wilkins, and Fischer acted exactly as described, such actions would not amount to excessive force in violation of Mr. Bolin's constitutional rights. Therefore, Corporal Vinson's, Deputy Wilkins's, and Deputy Fischer's requests for qualified immunity with respect their actions in Pod E-103 are **GRANTED**.

The same is not true of Deputy Koehler's and Sergeant Franks's actions. Deputy Koehler admits that he delivered two knee strikes to the left half of Mr. Bolin's body, allegedly because he attempted to stand up. The video evidence can neither prove nor disprove Deputy Koehler's version of the facts, so at summary judgment we are left with Mr. Bolin's insistence that he did not disobey commands while in the cell—which the jury can believe or disbelieve, as the matter constitutes a genuine, material dispute of fact. As for Sergeant Franks, he agreed that Mr. Bolin complied when ordered to kneel and place his hands on the wall in the cell, but "started to stand up" at some point, which necessitated Sergeant Franks tasing him twice. As previously discussed, a tasing, when

not justified by any legitimate governmental purpose, can constitute excessive force. *See Smith,* 759 F.3d at 861; *Edwards*, 750 F.3d at 732. Therefore, Deputy Koehler and Sergeant Franks are **DENIED** summary judgment with respect to their actions in Pod E-103.

### D.  Official Capacity Claims

Mr. Bolin asserts in the Amended Complaint that Benton County, Arkansas and the Benton County Sheriff's Office violated his constitutional rights by failing to properly train employees on the proper use of force, failing to investigate allegations of excessive force, failing to discipline officers for violations of policy related to excessive force, and establishing a custom and/or policy that sanctioned the use of excessive force. In support of his argument, Mr. Bolin cites to Benton County's use-of-force policy, which appears in the record at Document 41-1, and the depositions of certain officers who used force on Mr. Bolin and testified that they believed such force was appropriate and consistent with their training.

Counties and county officials named in their official capacities may be liable under § 1983 if an official policy or widespread custom or practice caused the plaintiff's injury. *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 690–91 (1978). The county cannot be held vicariously liable for the actions of its employees. *Id.* at 692–93. Rather, the county's official policy, custom, or practice must be the "moving force behind" the constitutional violation. *Id.* at 694. In their Motion for Summary Judgment, the County Defendants argue that Mr. Bolin has no evidence of an unconstitutional county policy or custom that was the moving force behind the violation of his constitutional rights. Mr. Bolin fails to respond with any proof; he has not pointed to any evidence of an unconstitutional

Benton County policy or custom. *See* Doc. 57. Summary judgment is therefore **GRANTED** to the County Defendants as to all official capacity claims.

### E. Claim Brought under Arkansas Code § 16-118-107

The County Defendants ask that the Court dismiss Mr. Bolin's claim for relief under § 16-118-107, which provides a cause of action to "[a]ny person injured or damaged by reason of conduct of another person that would constitute a felony under Arkansas law." Defendants suggest this statute does not apply to police officers in the prison or jail context, though they cite no law to establish this. Further, they suggest this statute is unconstitutional. The Court has not uncovered any court ruling declaring this statute unconstitutional and declines to make that finding here based on Defendants' insistence alone. The record contains some evidence from which a jury could find that Defendants Loya and/or Wilkins committed a battery under Arkansas law. Therefore, the Court declines to dismiss this claim on summary judgment. Depending on the evidence at trial, Defendants may raise this argument again on a motion under Rule 50(a).

### F.  Damages for Lost Wages or "Brain Injury"

Lastly, Defendants assert that Mr. Bolin should not be permitted to seek damages for lost wages or medical expenses for a "brain injury" because he failed to mention these types of damage in his Amended Complaint and should not be permitted to pursue them at trial. The Court declines to dismiss any categories of damages on summary judgment and reserves such matters for trial.

### IV. CONCLUSION

**IT IS ORDERED** that Separate Defendant Mosley's Motion for Summary Judgment (Doc. 35) is **GRANTED**.

**IT IS FURTHER ORDERED** that the County Defendants' Motion for Summary Judgment (Doc. 40) is **GRANTED IN PART AND DENIED IN PART** as follows:

- all claims against Defendants Monday, Wright, White, Lampkin, Simpson, Baker, Martin, Cornelison, Cooper, Beard, and Golden are **DISMISSED WITH PREJUDICE** due to the expiration of the statute of limitations;

- summary judgment as to Deputy Loya is **DENIED** with respect to his use of force in Incident One, as described above;

- summary judgment as to Deputy Wilkins is **DENIED** with respect to his use of force in the initial takedown in the E-Pod Hallway but **GRANTED** as to his use of force in Pod E-103 in Incident Two, as described above;

- summary judgment as to Defendants Fischer and Vinson is **GRANTED** with respect to all claims against them, and they are **DISMISSED WITH PREJUDICE**;

- summary judgment as to Defendants Koehler and Franks is **GRANTED** with respect to their use of force in the E-Pod Hallway and **DENIED** with respect to their use of force in Pod E-103 in Incident Two, as described above; and

- all official capacity claims are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED** on this 5th day of December, 2024.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE